**John M. Coletti**, OSB No.942740
Email:  john@paulsoncoletti.com
**Paulson Coletti Trial Attorneys PC**
1022 NW Marshall Street, Ste. 450
Portland, OR  97209
Tel: (503) 226.6361

**Richard D. McCune**, CA Bar No. 132124*
Email: rdm@mccunewright.com
**McCune Wright Arevalo LLP**
3281 E. Guasti Road, Suite 100
Ontario, CA 91761
Tel: (909) 557.1250

**Taras Kick**, CA Bar No. 143379*
Email: taras@kicklawfirm.com
**The Kick Law Firm, APC**
815 Moraga Drive
Los Angeles, CA  90049
Tel: (310) 395.2988

**Kevin Roddy**, NYSBA No. 652585*
Email: kroddy@wilentz.com
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095
Tel: (732) 636.8000
*pro hac vice* applications to be submitted

Attorneys for Plaintiff Shante Hayes and the Putative Class

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON – PORTLAND DIVISION

| | |
|---|---|
| **SHANTE HAYES, individually, and on behalf of others similarly situated,** | Case No. |
|   **Plaintiff,** | |
| **v.** | **CLASS ACTION COMPLAINT** |
| **UMPQUA BANK and DOES 1 through 100,** | |
|   **Defendants.** | |

**Page 1 of 27 - Complaint**

## CLASS ACTION COMPLAINT

Plaintiff Shante Hayes ("Plaintiff"), by her attorneys, hereby bring this class and representative action against Umpqua Bank and DOES 1 through 100 (collectively "Umpqua" or "Defendant").

## NATURE OF THE ACTION

1. All allegations herein are based upon information and belief except those allegations which pertain to Plaintiff or her counsel. Allegations pertaining to Plaintiff or her counsel are based upon, *inter alia*, Plaintiff's or her counsel's personal knowledge, as well as Plaintiff's or her counsel's own investigation. Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2. This is a class and representative action brought by Plaintiff to assert claims in her own right, and in her capacity as the class representative of all other persons similarly situated, and in her capacity as a private attorney general on behalf of the members of the general public. Umpqua wrongfully charged Plaintiff and the Class Members overdraft fees and Non-Sufficient Funds fees.

3. This class action seeks monetary damages, restitution, and injunctive relief due to Umpqua's policy and practice of charging multiple Non-Sufficient Funds Fees ("NSF fees") and/or NSF fees followed by an overdraft fee on the *same* electronic item, a practice which breaches Umpqua's contracts with its customers, who include Plaintiff and the members of the class.

## PARTIES

4. Plaintiff Shante Hayes is a resident of Portland, Oregon and had a checking account with Umpqua at all times relevant to the class action allegations.

5. Based on information and belief, Defendant Umpqua is and has been a bank with

its headquarters located in Portland, Oregon. Umpqua is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)).

6.    Without limitation, defendants DOES 1 through 100, include agents, partners, joint ventures, subsidiaries and/or affiliates of Umpqua and, upon information and belief, also own and/or operate Umpqua branch locations. Each of defendants DOES 1 through 100 is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)). As used herein, where appropriate, the term "Umpqua" is also inclusive of Defendants DOES 1 through 100.

7.    Plaintiff is unaware of the true names of defendants DOES 1 through 100. Defendants DOES 1 through 100 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against defendants DOES 1 through 100 when the true names are ascertained, or as permitted by law or by the Court.

8.    There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including DOES) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are *alter egos* in that the named defendants effectively operate as a single enterprise, or are mere instrumentalities of one another.

9.    At all material times herein, each defendant was the agent, servant, co-conspirator and/or employer of each of the remaining defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants, and ratified and approved the acts of the other defendants. However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

10.    Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was

actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

11.    As to the conduct alleged herein, each act was authorized, ratified or directed by Defendant's officers, directors, or managing agents.

## VENUE AND JURISDICTION

12.    This Court has subject matter jurisdiction over this case, among other reasons, pursuant to 28 U.S.C. § 1332(d).

13.    Venue is proper in this District, among other reasons, pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a resident of this District.

## FACTUAL ALLEGATIONS

14.    Umpqua is a bank with over 350 branches in 5 states and holds approximately $28 billion in assets.  For the twelve months ended December 31, 2019, it reported net income of $354.1 million, up from $316.3 million for the twelve months ended December 31, 2018. Umpqua offers its consumer banking customers a checking account.  Features of an Umpqua checking account include: the ability to write checks; withdraw money from ATMs; schedule Automated Clearing House (ACH) transactions (certain recurring payments); a debit card; and, other types of transactions that debit from a checking account.

15.    In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), Umpqua assesses overdraft fees and NSF fees to customer accounts when it claims to have determined that a customer's account has been overdrawn.

16.    Overdraft fees and NSF fees are among the primary fee generators for banks. According to a banking industry market research company, Moebs Services, in 2018 alone, banks generated an estimated $34.5 billion from overdraft fees.  Further, while since 2000 the average overdraft transaction is substantially lower and provides much less risk and exposure to the bank, the average cost of overdraft fees per transaction has gone up from $15 in 2000 to $29 in 2018.  Defendant Umpqua has far outpaced this high average banking fee, charging instead a $35 fee.  Furthermore, according to the Consumer Financial Protection Bureau, this is all despite

the fact that over 75% of negative balances are cured by the consumer within one week.

https://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf

17.     The high cost of an overdraft fee is usually unfairly punitive.  In a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their account by mistake.  (May 2012 Pew Charitable Trust report entitled "Overdraft America:  Confusion and Concerns about Bank Practices", at p. 4).   More than 60% of the transactions that resulted in a large overdraft fee were for less than $50.  (June 2014 Pew Charitable Trust report entitled "Overdrawn", at p. 8).  More than 50% of those who were assessed overdraft fees do not recall opting into an overdraft program (*id*. at p. 5), and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than paying the transaction into overdraft and charging a very large fee (*id*. at p. 10).

18.     Unfortunately, the customers who are assessed these fees are the most vulnerable customers.  Younger, lower-income, and non-white account holders are among those who were more likely to be assessed overdraft fees.  (*Id*. at p. 1).  A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old.  (*Id*. at p. 3).  More than 50% of the customers assessed overdraft fees earned under $40,000 per year.  (*Id*. at p. 4).  Non-whites are 83% more likely to pay an overdraft fee than whites.  (*Id*. at p. 3).

19.     As a result of banks taking advantage of millions of customers through the unfair practice of charging overdraft fees through methodologies that maximize the possible number of expensive overdraft fees to be charged, there has been a substantial amount of litigation over the past few years. The outcome of these cases has predominantly fallen in favor of plaintiffs with the banks repaying their customers over one billion dollars for the unlawfully assessed overdraft fees by way of jury verdicts and settlements.[1]

20.     The federal government has also stepped in to provide additional protections to

---

[1] http://files.consumerfinance.gov/f/documents/CFPB_Arbitration_Agreements_Notice_of_Prop osed_ Rulemaking.pdf, at p. 74-75.

customers with respect to abusive overdraft policies.  In 2010, the Federal Reserve Board

enacted regulations giving financial institutions the authority to charge overdraft fees on ATM

and one-time debit card transactions only if the institution first obtained the affirmative consent

of the customer to do so. (12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule")).

21.     To qualify as affirmative consent, the Opt-In Contract must include, but is not

limited to the following:

- The customer must be provided the overdraft policy, including the dollar
  amount of any fees that will be charged for an overdraft, and the
  maximum number of fees that can be assessed on any given day (if there is
  no maximum, that fact must be stated);

- The financial institution must state whether alternatives, such as linking
  the checking account to a secondary account or line of credit, are
  available.

- The opt-in consent must be obtained separately from other consents and
  acknowledgements;

- The consent cannot serve any purpose other than opting into the overdraft
  program;

- The consent cannot be a pre-selected checked box;

- The financial institution may not provide different terms for the account
  depending on whether the customer opted in to the overdraft program.

If the financial institution does not obtain proper, affirmative consent from the customer that

meets all of the requirements of Regulation E's Opt-in Rule, including fulfilling each of the

above requirements, then it is not permitted to charge overdraft fees on ATM and one-time debit

card transactions.  On information and belief, although formal discovery will be required to

confirm this, to the extent that Umpqua engages in a Reg E overdraft program, Umpqua did not

fulfill these prerequisites.

22.     Further, at all relevant times, on information and belief, Umpqua has had an

overdraft and NSF fee program in place for assessing such fees which, *inter alia*, is: (1) contrary to the express and implied terms of its contract with members; (2) contrary to Umpqua's representations about its overdraft program to its members; and (3) contrary to its members' expectations regarding the assessment of overdraft fees.

23.     Umpqua has an improper practice of charging multiple NSF fees, or an NSF fee followed by an overdraft fee, for the same electronic item.  Umpqua charges a $35 fee when an electronic item is first processed for payment and Umpqua determines that, in its opinion, there is not enough money in the account to cover the item.  Umpqua then charges an *additional* NSF fee, or an overdraft fee following the first NSF fee, if the same item is presented for processing again, even though the account holder took no action to resubmit the transaction for payment.

24.     This charging of more than one fee for the same item breaches Umpqua's Account Agreement.  Umpqua's Account Agreement states at page 6, "If a check, item or transaction is presented without sufficient funds in your account to pay it, we may, at our discretion, pay the item (creating an overdraft) **or** return the item for insufficient funds (non-sufficient funds - NSF)."  (Emphasis added.)  It does not state Umpqua may charge "an overdraft fee **and** an NSF fee," but rather states Umpqua may charge, "an overdraft fee **or** an NSF fee." It also states in that same section, "The amounts of the overdraft and NSF fees are disclosed elsewhere."

25.     In the next section of the Account Agreement, still on page 6 and entitled "Returned Items," the contract states,  "RETURNED ITEMS - If a check or other item you deposit or cash is returned to us for any reason, at any time, we may debit your account for the amount of the item. We may also debit your account for any interest you may have provisionally earned on the item. We also charge you **a fee** for each returned item." (Emphasis added.)  In other words, the contract drafted by Defendant itself states "we also charge you **a fee**," singular, not plural "multiple fees" and it says "for each returned item" and does not say "for each presentment of the item."

26.     When the Account Agreement states on page 6, "The amounts of the overdraft

and NSF fees are disclosed elsewhere," in addition to the "Returned Items" section discussed above, this likely also refers to Umpqua's Fee Schedule.  The Fee Schedule states as follows:

| Overdraft Paid Item | An item that has been paid against insufficient funds in your account.  We will not charge for an Overdraft Paid Item if your ending account balance is overdrawn by $5.00 or less. | $35 per item |
|---|---|---|
| Non-sufficient Funds (NSF) Returned Item | An item that has been returned due to insufficient funds in your account. | $35 per item |

27.    In other words, to the extent that Umpqua's Account Agreement arguably might have been ambiguous on the issue of whether it had contracted with its customers to charge an NSF fee or Overdraft Fee on a "per item" basis or on a "per each presentment of the item", the Fee Schedule clarifies this ambiguity in favor of Umpqua's customers that Umpqua had contracted to charge the fee "per item" and not "per each and every presentment of the item" or "per each retry of the item."  A "re-presentment" or a "retry" of an "item" does not change it into a new or different "item."  It is still the same "item" being presented by the same merchant in the same dollar amount, not a new "item."  An electronic item reprocessed after an initial return for insufficient funds, especially through no action by the customer, cannot and does not fairly become a new, unique additional "item" for fee assessment purposes.

28.    Nowhere does the Account Agreement or Fee Schedule state that Umpqua may charge multiple overdraft or NSF fees per item.  The contracts also never have an adjective such as "debit" in front of the word "item" to arguably create an ambiguity against the customer's interpretation.

29.    Of note, many financial institutions that do engage in this same or similar abusive practice of charging repeat NSF fees for the same "item" at least at a minimum make this clear in their Account Agreements, Fee Schedules, or Opt-ins, unlike Defendant.  They typically use the terminology such as "per presentment" or "per each presentment" to make this clear, and often also add far more in explaining this to be sure it not ambiguous.  The following are some examples from other banks and credit unions that make clear what Umpqua was contractually required to do, if it was going to engage in charging multiple $35 NSF fees, or overdraft fees following an NSF fee, for the same item.

**Page 8 of 27 - Complaint**

30.     Air Academy Federal Credit Union contracts for its NSF fee as follows: "$32.00 **per presentment**."

*See,* https://www.aafcu.com/fees.html (emphasis added) [last visited on or about March 17, 2020].

31.     Central Pacific Bank contracts unambiguously:

Items and transactions (such as, for example, checks and electronic transactions/payments) returned unpaid due to insufficient/non-sufficient ("NSF") funds in your account, **may be resubmitted one or more times for payment, and a $32 fee will be imposed on you each time an item and transaction resubmitted for payment is returned due to insufficient/nonsufficient funds**.

*See,* https://www.cpb.bank/media/1618/fee-001-rev-10-24-2019-misc-fee-schedule.pdf (emphasis added) [last visited on or about March 17, 2020].

32.     Community Bank, N.A. unambiguously contracts:

**You may be charged more than one Overdraft or NSF Fee if a merchant submits a single transaction multiple times after it has been rejected or returned**.

*See,* https://cbna.com/u/header/2019-Overdraft-and-Unavailable-Funds-Practices-Disclosure-FINAL-1.14.2020.pdf (emphasis added) [last visited on or about March 17, 2020].

33.     Delta Community Credit Union contracts unambiguously as follows:

"$30 **per presentment**."

*See,* https://www.deltacommunitycu.com/home/fees.aspx (emphasis added) [last visited on or about March 17, 2020].  Further, in its Account Contract, Delta unambiguously states as follows:

The Credit Union reserves the right to charge you an overdraft/insufficient funds fee if you write a check or initiate an electronic transaction that, if posted, would overdraw your Checking Account.  **Note that you may be charged an NSF fee each time a check or ACH is presented to us, even if it was previously submitted and rejected**.

*See,* https://www.deltacommunitycu.com/home/forms/member-savings-services-disclosures-and-agreements.aspx (emphasis added) [last visited on or about March 17, 2020].

34.     First Financial Bank contracts unambiguously:

Merchants or payees may present an item multiple times for payment if the initial or subsequent presentment is rejected due to insufficient funds or other reason (representment). **Each**

**presentment is considered an item and will be charged accordingly**."

*See,* https://www.bankatfirst.com/content/dam/first-financial-bank/eBanking_Disclosure_of_Charges.pdf (emphasis added) [last visited on or about March 17, 2020].

35.    First Hawaiian Bank unambiguously contracts:

> You agree that multiple attempts may be made to submit a returned item for payment and that multiple fees may be charged to you as a result of a returned item and resubmission.

*See,* https://www.fhb.com/en/assets/File/Home_Banking/FHB_Online/Terms_and_Conditions_of_FHB_Online_Services_RXP1.pdf (emphasis added) [last visited on or about March 17, 2020].

36.    First Northern Credit Union unambiguously contracts its NSF fee as,

"$22.00 **per each presentment and any subsequent representment(s)**."

*See,* https://www.fncu.org/feeschedule/?scpage=1&scupdated=1&scorder=-click_count (emphasis added) [last visited on or about March 17, 2020].

Further, in its Account Contract, First Northern unambiguously contracts as follows:

> You further agree that **we may charge a NSF fee each time an item is presented for payment even if the same item is presented for payment multiple times**. For example, if you wrote a check to a merchant who submitted the payment to us and we returned the item (resulting in a NSF fee), the merchant may re-present the check for payment again. If the second and any subsequent presentments are returned unpaid, **we may charge a NSF fee for each time we return the item. You understand this means you could be charged multiple NSF fees for one check** that you wrote as that check could be presented and returned more than once. **Similarly**, if you authorize a merchant (or other individual or entity) to electronically debit your account, such as an ACH debit, **you understand there could be multiple submissions of the electronic debit request which could result in multiple NSF fees**

*See,* (https://www.fncu.org/SecureAsset.aspx?Path=/7/Member_Agreement_November_1_2019.pdf (emphasis added) [last visited on or about March 17, 2020].

37.    Glendale Federal Credit Union unambiguously contracts its NSF fee as,

"$30 **per presentment**."

*See,* https://glendalefcu.org/pdf/fees.pdf (emphasis added) [last visited on or about March 17, 2020].

38.    Klein Bank contracts unambiguously:

[W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to pay an item for any other reason authorized by the terms and conditions governing your Bill Payment Account. **We will charge an NSF/Overdraft Fee** as provided in this section **regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.**

*See,* https://kleinbankonline.com/bridge/disclosures/ib/disclose.html (emphasis added) [last visited on or about March 17, 2020].

39.    Liberty Financial contracts its NSF fee unambiguously as:

"$27.00 **per presentment**."

*See,* https://liberty.financial/about/fee-schedule/  (emphasis added) [last visited on or about March 17, 2020].

40.    Los Angeles Federal Credit Union contracts its NSF fee unambiguously as:

"$29 **per presentment**."

*See,* https://www.lafcu.org/pdf/currentfees_bus.pdf (emphasis added) [last visited on or about March 17, 2020].

41.    Members First Credit Union contracts unambiguously:

We reserve the right to charge an Non-Sufficient Funds Fee (NSF Fee) each time a transaction is presented if your account does not have sufficient funds to cover the transaction at the time of presentment and we decline the transaction for that reason. **This means that a transaction may incur more than one Non-Sufficient Funds Fee (NSF Fee) if it is presented more than once…we reserve the right to charge a Non-Sufficient Funds (NSF Fee) for both the original presentment and the representment** [.]

*See,*
http://www.membersfirstfl.org/files/mfcufl/1/file/Membership_and_Account_Agreement.pdf
(emphasis added) [last visited on  or about March 17, 2020].

42.    Meriwest Credit Union unambiguously contracts its fee as:

"$35.00/item **per presentment**".

*See,* https://www.meriwest.com/sites/www.meriwest.com/files/media/consumer_feesched.pdf (emphasis added) [last visited on or about March 17, 2020].

43.    Partners 1ˢᵗ Federal Credit Union contracts unambiguously:

> Consequently, because **we may charge a fee for an NSF item each time it is presented, we may charge you more than one fee for any given item**. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*See,* https://www.partners1stcu.org/uploads/page/Consumer_Account_Agreement.pdf (emphasis added) [last visited on or about March 17, 2020].

44.    RBC Bank unambiguously contracts:

> "We may also charge against the Account an NSF fee for each item returned or rejected, **including for multiple returns or rejections of the same item**."

*See,* https://www.rbcbank.com/siteassets/Uploads/pdfs/Service-Agreement-for-Personal-Accounts.pdf (emphasis added) [last visited on or about March 17, 2020].

45.    Regions Bank contracts unambiguously:

> If an item is presented for payment on your account at a time when there is an insufficient balance of available funds in your account to pay the item in full, you agree to pay us our charge for items drawn against insufficient or unavailable funds, whether or not we pay the item. **If any item is presented again after having previously been returned unpaid by us, you agree to pay this charge for each time the item is presented for payment and the balance of available funds in your account is insufficient to pay the item**.

*See,* https://www.regions.com/virtualdocuments/Deposit_Agreement_6_1_2018.pdf (emphasis added) [last visited on or about March 17, 2020].

46.    Tyndall Federal Credit Union lists its NSF fee as:

> "$28.00 **per presentment** (maximum 5 per day)."

*See,* https://tyndall.org/member_center/document_center/fee_schedule (emphasis added) [last visited on or about March 17, 2020].

47.    USE Credit Union contracts unambiguously:

> "**Fees are charged per presentment, meaning the same item is**

**subject to multiple fees if presented for payment multiple times**."

*See,* https://www.usecu.org/home/Files/static/documents/Schedule_of_Fees.pdf (emphasis added) [last visited on or about March 17, 2020].

48.    Therefore, if Umpqua wanted to engage in this abusive practice, it was at least required to state and contract so, as these other financial institutions all do. All these quotations show that the financial institutions differentiate between an "item" and a "presentment" of an item when calculating NSF or overdraft fees. Umpqua does not use the term "presentment" in its contract, but instead says it will only charge a fee "per item." However, in practice Umpqua charges the fee "per each presentment of the item" not "per item" as it contracted

49.    Umpqua's practice of charging multiple NSF fees, or an overdraft fee following an NSF fee, for a single item is particularly egregious because, as described, although discovery will be required to confirm it, on information and belief, Umpqua assesses fees using an improper calculation of the balance available in a member's account,  causing additional confusion and ambiguity.

50.    Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts.

51.    Plaintiff did not and could not have, exercising reasonable diligence, discovered both that she had been injured and the actual cause of that injury until she met with her attorneys in or about March 2020.  This not only reasonably delayed discovery, but Defendant's affirmative representations and actions also equitably toll any statute of limitations, and, also additionally equitably estop Defendant.

52.    Therefore, Plaintiff, on behalf of herself and all others similarly situated, seeks relief as set forth below.

53.    Plaintiff was harmed by Defendant's policy and practice of charging multiple fees on the same item.  As stated, Plaintiff entered into contracts with Umpqua during the relevant

class periods wherein Umpqua contracted to charge overdraft fees or NSF fees only "per item" not "per each presentment of an item," and only "**a** fee" not "multiple fees." It will be necessary to obtain Defendant's records to determine each instance of such wrongful overdraft or NSF fees, but Umpqua breached its contracts with Plaintiff by charging multiple NSF fees on the same item, and by charging an overdraft fee following an NSF fee, at least on the following occasions. On December 2, 2019, Plaintiff was charged a $35 NSF Fee when a payment she had attempted to make for insurance in the amount of $144.02 was returned for her supposedly not having enough money in the account to cover it at the time when she made the payment. She was again charged an additional $35 NSF Fee for this same item on December 6, 2019, when Umpqua again refused to pay the same item, but charged an additional NSF fee for rejecting the item. As a result, Umpqua charged Plaintiff $70 for rejecting this single $144.02 item. As another example, on April 1, 2019, Plaintiff Hayes was charged a $35 "NSF fee" for a debit item of $2,218.26 when according to Defendant there supposedly were insufficient funds in the account to cover the item. Three days later, Umpqua again charged a $35 fee for this same item, this time deciding to pay the item rather than reject, and charged what it was now calling an "Overdraft fee" for this same re-presented item. According to Umpqua, Plaintiff was in a negative balance both times when the item was presented for payment, but rather than pay it the first time and just charge an "Overdraft Fee," Umpqua in bad faith elected to reject the item the first time, and instead charge a second fee when it paid it. This is despite its Account Agreement stating "an overdraft fee **or** an NSF fee". Instead, Umpqua imposed both "an overdraft fee **and** an NSF fee."

54.     Plaintiff has a reasonable belief that a complete review of Plaintiff's and Umpqua's records will show multiple instances in which Plaintiff was charged multiple overdraft or NSF fees for the same item and/or were charged fees when there was enough money in the

account to cover the transaction, even though Umpqua's contracts states that "a fee" will only be charged when an "item" cannot be paid because there is not enough money in the member's account.  Further, although discovery will be required to confirm, on information and belief Umpqua uses less than the full amount of money in a customer's account to determine whether there are sufficient funds to pay an item, and nowhere does Umpqua state that it would do this.

55.    Plaintiff was harmed by these practices when she was assessed overdraft fees and NSF fees when she should not have been. A complete evaluation of Umpqua's records is necessary to determine the full extent of Plaintiff's harm from this practice as well.

## CLASS ACTION ALLEGATIONS

56.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

57.    Plaintiff bring this case, and each of her respective causes of action, as a class action pursuant to Federal Rule of Civil Procedure 23(a)(b)(1), (b)(2) and (b)(3) on behalf of the following class.

58.    The "Class" is composed of:

**The Repeat NSF Class:**

> **All United States residents who have or have had accounts with Umpqua who incurred an NSF fee more than once for the same item, or an overdraft fee following an NSF fee for the same item, during the period beginning six years preceding the filing of this Complaint and ending on the date the class is certified.**

**The Repeat NSF Sub-Class:**

> **All Oregon residents who have or have had accounts with Umpqua who incurred an NSF fee more than once for the same item, or an overdraft fee**

**following an NSF fee for the same item, during the period beginning six years preceding the filing of this Complaint and ending on the date the class is certified.**

59.     Excluded from the Classes are: (1) any entity in which Defendant has a controlling interest; (2) officers or directors of Defendant; (3) this Court and any of its employees assigned to work on the case; and (4) all employees of the law firms representing Plaintiff and the Class Members.

60.     This action has been brought and may be properly maintained on behalf of each member of the Class pursuant to Federal Rule of Civil Procedure 23.

61.     **Numerosity** – The members of the Class are so numerous that a joinder of all members would be impracticable.  While the exact number of Class Members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes that the Classes are likely to include thousands of members based on the fact that Umpqua has approximately $28 billion in assets and operates approximately 350 branches in 4 states.

62.     Upon information and belief, Defendants have databases, and/or other documentation, of its customers' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of Umpqua's members have been harmed by its practices and thus qualify as Class Members.  Further, the Class definition identifies groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to the Class Members through notice published in newspapers or other publications.

63.    **Commonality** – This action involves common questions of law and fact.  The

questions of law and fact common to both Plaintiff and the Class Members include, but are not

limited to, the following:

    a.    Whether, pursuant to the Account Agreement, Defendant

contracted that it would charge more than one NSF fee for the same item, each

time that same item was presented or re-presented;

    b.    Whether, pursuant to the Fee Schedules, Defendant disclosed it

would charge more than one NSF for the same item, charging an NSF each time

the same item was re-presented;

    c.    Whether, pursuant to the Account Agreement, Defendant

contracted that it would charge an overdraft fee on the same item after already

having charged an NSF fee on that same item;

    d.    Whether, pursuant to the Fee Schedule, Defendant disclosed it

would charge an overdraft fee on the same item after already having charged an

NSF fee on that same item.

    e.    Whether the Account Agreement is ambiguous on the issue of

whether Defendant would charge an NSF Fee, or an overdraft fee following an

NSF fee, every time the same item was presented;

    f.    Whether the Fee Schedule is ambiguous on the issue of whether

Defendant would charge an NSF Fee, or an overdraft fee following an NSF fee,

every time the same item was presented.

64.    **Typicality** – Plaintiff's claims are typical of all of the members of the Class.  The

evidence and the legal theories regarding Defendant's alleged wrongful conduct committed

against Plaintiff and all of the Class Members are substantially the same because all of the

relevant agreements between Defendant and its customers, including the Account Agreement and Fee Schedules, were identical as to all relevant terms, and also because, *inter alia*, the challenged practices of charging customers for overdraft fees or NSF fees are uniform for Plaintiff and all Class Members.  Accordingly, in pursuing her own self-interest in litigating her claims, Plaintiff will also serve the interests of the other Class Members.

65.    **Adequacy** – Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained competent counsel experienced in class action litigation to ensure such protection.  There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate. Plaintiff and her counsel intend to prosecute this action vigorously.

66.    **Predominance and Superiority** – The matter is properly maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class Members.  Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter.  Because the injuries suffered by the individual Class Members are relatively small, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class Members to individually seek redress for Defendant's wrongful conduct.  Even if any individual person or group(s) of Class Members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court.  In contrast, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for

the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Absent a class action, Plaintiff and the Class Members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of their ill-gotten gains.

67.     Plaintiff does not believe that any other Class Members' interest in individually controlling a separate action is significant, in that Plaintiff has demonstrated above that her claims are typical of the other Class Members and that she will adequately represent the Class. This particular forum is a desirable forum for this litigation because both Defendant resides in this District. Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

68.     Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members.  Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices.  To the extent that any further notices may be required, Plaintiff anticipates the use of additional media and/or mailings.

69.     This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure in that:

        a.   Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the Class format, prosecution of separate actions by individual members of the Class will create the risk of:

            1.   Inconsistent or varying adjudications with respect to individual

members of the Class which would establish incompatible

standards of conduct for the parties opposing the Class; or

2.  Adjudication with respect to individual members of the Class,

which would as a practical matter be dispositive of the interests of

the other members not parties to the adjudication or substantially

impair or impede their ability to protect their interests. The parties

opposing the Class have acted or refused to act on grounds

generally applicable to each member of the Class, thereby making

appropriate final injunctive or corresponding declaratory relief

with respect to the Class as a whole.

b.  Common questions of law and fact exist as to the members of the Class and

predominate over any questions affecting only individual members, and a

class action is superior to other available methods of the fair and efficient

adjudication of the controversy.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

70.    The preceding allegations are incorporated by reference and re-alleged as if fully
set forth herein.

71.    Plaintiff and each of the Class Members entered into an Account Agreement with
Defendant covering the subject of overdraft and NSF transactions.  This contract was drafted by
and is binding upon Defendant.

72.    Nowhere did the Account Agreement state that Umpqua would assess an
additional NSF fee every time the same electronic item was re-presented for processing or
submitted as a "retry."  Also, nowhere did the Account Agreement state that Umpqua would

assess an overdraft fee following an NSF fee on the same item when the same item was re-presented for processing or submitted as a "retry." Umpqua wrongfully treated a "retry" as a new and separate "item" in violation of the terms of the Account Agreement. This also contradicted its own Fee Schedule which said that an NSF fee or Overdraft fee would be "per item" not "per each presentment of an item."

73.     Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Account Agreement, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

74.     Defendant breached the express and implied terms of the Account Agreement and Fee Schedule by, *inter alia*, assessing multiple NSF and overdraft fees for the same electronic item.

75.     As a proximate result of Defendant's breaches, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

<u>**SECOND CAUSE OF ACTION**</u>
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

76.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

77.     Plaintiff and each of the Class Members entered into contracts with Defendant covering the subject of overdraft transactions, which has been identified herein as the Account Agreement contract which covers overdraft fees and NSF fees, as well as the Fee Schedule. The contracts were drafted by and are binding upon Defendant.

78.     In the contracts, Umpqua promised that it would only assess "a fee" (singular) when it determined a member did not have enough money in his or her account to cover an

"item," not "multiple fee**s"** for the same "item." In the Fee Schedule it stated the NSF fee or

overdraft fee would be "per item," not "per each presentment of an item."  Defendant also

promised that it would only assess "an overdraft *or* NSF fee," not both "an overdraft fee *and* an

NSF fee."

79.     Further, good faith is an element of every contract.  Whether by common law or

statute, all contracts impose upon each party a duty of good faith and fair dealing.  Good faith

and fair dealing, in connection with executing contracts and discharging performance and other

duties according to their terms, means preserving the spirit—not merely the letter—of the

bargain.  Thus, the parties to a contract are mutually obligated to comply with the substance of

their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to

specify terms, constitute examples of bad faith in the performance of contracts.

80.     The material terms of the contracts therefore included the implied covenant of

good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the

exercise of fair dealing, deal with Plaintiff and each Class member fairly and honestly and do

nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class Members'

rights and benefits under the contracts.

81.     Plaintiff and the Class Members have performed all conditions, covenants, and

promises required by each of them on their part to be performed in accordance with the terms

and conditions of the contract, except for those they were prevented from performing or which

were waived or excused by Defendant's misconduct.

82.     Defendant breached the implied covenant of good faith and fair dealing based,

*inter alia*, on its practices of assessing multiple overdraft and NSF fees for the same electronic

item.  Defendant could easily have avoided acting in this manner by simply changing the

programing in its software to  charge only an NSF "per item" as its own Fee Schedule stated it

would do.  It is undeniable that Umpqua knew the item on which it was charging a second fee was the same "item" because it itself labeled the second fee as a "retry" fee.  Defendant equally easily could have avoided charging both an overdraft fee following an NSF fee for the same item, and instead charged only an overdraft fee or an NSF fee, as its Account Agreement stated, by simply changing the programing in its software to  charge only one fee or the other for the "item", rather than both fees for the same item.  It is undeniable that Umpqua knew the item on which it was charging a second fee was the same "item" because it itself labeled the second fee as a "retry" fee.    Finally, Umpqua also acted in breach of the covenant of good faith and fair dealing when electing to first charge an NSF fee then later followed by an overdraft fee for the same item, because if it instead had first charged an overdraft fee rathe rthan an NSF fee, the item could not have been re-presented to generate a second fee since it already would have been paid.  Instead, Plaintiff breached the covenant of good faith by instead first charging the NSF Fee on the same item it would then pay into overdraft when represented a second time and generating a second fee. Defendant unilaterally elected to and did program its software to create accounting gimmicks such as this which would maximize its overdraft and NSF fees.   In so doing, and in implementing its overdraft and NSF fee programs for the purpose of increasing and maximizing overdraft fees, Defendant executed its contractual obligations in bad faith, depriving Plaintiff and the Class Members of the full benefit of the contracts.

83.    As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## THIRD CAUSE OF ACTION
### (Unjust Enrichment/Restitution)

84.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

85.     As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft and NSF fees.

86.     Because Plaintiff and the Class Members paid the erroneous overdraft and NSF fees and repeat NSF fees assessed by Defendant, Plaintiff and the Class Members have conferred a benefit on Defendant, albeit undeservingly.  Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred.  Should it be allowed to retain such funds, Defendant would be unjustly enriched.  Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

## FOURTH CAUSE OF ACTION
### (Money Had and Received)

87.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

88.     Defendant has obtained money from Plaintiff and the Class Members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

89.     As a result, Defendant has in its possession money which, in equity, belongs to Plaintiff and the Class Members, and thus, this money should be refunded to Plaintiff and the Class Members.  Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

## FIFTH CAUSE OF ACTION
### (Violation of Oregon Unlawful Trade Practices Act,  § 646.608, et seq.)

90.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

91.     Umpqua violated at least the following sections of the Oregon Unlawful Trade Practices Act, § 646.608:

(e) Represents that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that the real estate, goods or services do not have or that a person has a sponsorship, approval, status, qualification, affiliation, or connection that the person does not have.

(g) Represents that real estate, goods or services are of a particular standard, quality, or grade, or that real estate or goods are of a particular style or model, if the real estate, goods or services are of another.

(i) Advertises real estate, goods or services with intent not to provide the real estate, goods or services as advertised, or with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity.

(k) Makes false or misleading representations concerning credit availability or the nature of the transaction or obligation incurred.

(m)Performs service on or dismantles any goods or real estate if the owner or apparent owner of the goods or real estate does not authorize the service or dismantling.

(s) Makes false or misleading representations of fact concerning the offering price of, or the person's cost for real estate, goods or services.

(t) Concurrent with tender or delivery of any real estate, goods or services fails to disclose any known material defect or material nonconformity.

(u) Engages in any other unfair or deceptive conduct in trade or commerce.

92.    Umpqua's violations of § 646.608 were willful, and also reckless or knowing, all as alleged above, and as such Plaintiff and the class members are entitled to actual damages of all fees they paid in excess of one NSF or overdraft fee on an "item," and also are entitled to statutory damages.

## **PRAYER**

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1.    For an order certifying this action as a class action;

2.      For compensatory damages on all applicable claims and in an amount to be proven at trial;

3.      For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

4.      For statutory damages;

5.      For an order enjoining the wrongful conduct alleged herein;

6.      For costs;

7.      For pre-judgment and post-judgment interest as provided by law;

8.      For attorneys' fees under the Oregon Unlawful Trade Practices Act, the common fund doctrine, and all other applicable law; and

9.      For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class Members demand a trial by jury on all issues so triable.

Dated: April 26, 2020                         Respectfully submitted,


By  *s/ John M. Coletti*
John M. Coletti, OSB No. 942740
john@paulsoncoletti.com
Paulson Coletti
1022 NW Marshall Street, Suite 450
Portland, OR 97209
Tel: (503) 226.6361
Fax: (503) 226.6276

Richard D. McCune, CA Bar No. 132124*
Rdm@mccunewright.com
MCCUNE • WRIGHT • AREVALO LLP
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone:     (909) 557-1250
Facsimile:      (909) 557 1275

Taras Kick, CA Bar No. 143379*
Taras@kicklawfirm.com
THE KICK LAW FIRM, APC
815 Moraga Drive
Los Angeles, California 90049
Telephone: (310) 395-2988
Facsimile: (310) 395-2088

Kevin Roddy, NYSBA NO. 652585 *
kroddy@wilentz.com
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095
Telephone:  (732) 636-8000
Facsimile:  (732) 726-6686

Attorneys for Plaintiff Shante Hayes and the
Putative Class

*Pro Hac Vice applications to be submitted

## Certificate of Filing

I HEREBY CERTIFY that on the 27th day of April, 2020, I filed this original Complaint by Electronic Filing:

Trial Court Administrator
US District Court
740 US Courthouse
1000 SW Third Avenue
Portland, OR  97204-2902

By  s/ John M.Coletti
   John M. Coletti, OSB No. 942740
   Of Attorneys for Plantiff